SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
   A Limited Liability Partnership
   Including Professional Corporations
STEPHEN S. KORNICZKY, Cal. Bar No. 135532
skorniczky@sheppardmullin.com
MARTIN R. BADER, Cal. Bar No. 222865
mbader@sheppardmullin.com
MATTHEW W. HOLDER, Cal Bar. No. 217619
mholder@sheppardmullin.com
RYAN P. CUNNINGHAM, Cal Bar No. 275813
rcunningham@sheppardmullin.com
12275 El Camino Real, Suite 200
San Diego, California 92130-2006
Telephone:858.720.8900
Facsimile:858.509.3691

Attorneys for u-blox AG.

UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| U-BLOX AG, U-BLOX SAN DIEGO, INC., AND U-BLOX AMERICA, INC.,<br><br>        Plaintiffs,<br><br>        v.<br><br>KONINKLIJKE PHILIPS N.V.,<br><br>        Defendant. | Case No.____'18 CV 1627 JAH JLB___<br><br>**COMPLAINT FOR:**<br><br>**(1) Breach Of Contract;**<br>**(2) Promissory Estoppel;**<br>**(3) Declaratory Judgment;**<br>**(4) Antitrust Monopolization In Violation Of Section 2 Of The Sherman Act;**<br>**(5) Declaratory Judgment of Non-Infringement of U.S. Patent No. 7,127,247; and**<br>**(6) Declaratory Judgment of Non-Infringement of U.S. Patent No. 6,546,062.**<br><br>**JURY TRIAL DEMANDED** |

Plaintiffs u-blox AG, u-blox San Diego, Inc., and u-blox America, Inc. (collectively, "u-blox" or "Plaintiffs") allege as follows for its Complaint against Koninklijke Philips N.V. ("Philips" or "Defendant"):

## INTRODUCTION

1.     u-blox brings this lawsuit against Philips because of Philips' failure to license its standard essential patents ("SEPs") on fair, reasonable, and non-discriminatory (also known as "FRAND") terms and conditions.

2.     u-blox is a leading fabless semiconductor provider of embedded positioning and wireless communication products.  u-blox develops cellular modules incorporating a variety of different cellular technologies, including GSM/GPRS, UMTS/HSPA(+), NB-IoT, and LTE Categories M1, 1, 4, and 6.

3.     Philips has declared a number of its patents to be essential to the 2G, 3G, and/or 4G cellular standards established by the European Telecommunications Standards Institute ("ETSI").  In declaring its patents as essential to these standards, Philips made public and binding commitments to all potential implementers of the standards to license the declared patents on FRAND terms and conditions. Consistent with the intent of ETSI's Intellectual Property Rights ("IPR") Policy, u-blox and other implementers relied on Philips' FRAND commitment and invested significant resources to develop products that practice the 2G, 3G, and 4G standards. After the standards were approved incorporating Philips' allegedly essential patented technology — requiring all implementers of those portions of the standard to practice that technology and excluding alternative technologies — it became abundantly clear that Philips' promises to license its allegedly essential patents on FRAND terms and conditions were intentionally false.

4.     Philips has no intention of granting u-blox a license to its allegedly essential 2G, 3G, and 4G patents on FRAND terms and conditions.  u-blox is a willing licensee and has been attempting to negotiate a license to Philips' alleged SEPs for well over two years.  During the course of negotiations, Philips has made

-1-

repeated demands that violate its FRAND commitments, including but not limited to:

- Demanding royalty rates that are far in excess of fair and reasonable (*ex ante*) value of Philips' SEPs;

- Discriminating against u-blox and violating ETSI guidelines by demanding u-blox pay higher royalty rates than other implementers;

- Demanding u-blox pay royalties for alleged SEPs covering portions of the standard not implemented by certain u-blox products;

- Demanding royalty rates that do not account for the expiration of Philips' alleged SEPs over the course of the license; and

- Demanding royalties on alleged SEPs which are unenforceable due to patent exhaustion.

5.      Philips induced companies like u-blox to develop and market products implementing the 2G, 3G, and 4G technologies with intentionally false promises to license on FRAND terms and conditions.  Now that Philips has excluded alternative technologies as a result of its false promises, Philips is attempting to exploit its market position to demand unreasonably high and discriminatory licensing terms from u-blox.  Philips has rejected u-blox's entreaties to enter into a license agreement at a fair and reasonable royalty rate that is free from discrimination.  As a result, u-blox has no choice but to turn to the Court to enjoin Philips from engaging in anticompetitive conduct and to establish the FRAND terms and conditions for a license to Philips' 2G, 3G, and 4G SEPs.

## **NATURE OF THE ACTION**

6.      u-blox brings this action in response to Philips' breach of its commitments to ETSI, the 3rd Generation Partnership Project ("3GPP"), and their members and affiliates — including u-blox — to license patents it asserted to be essential to cellular technologies known as second generation ("2G"), third

generation ("3G"), and fourth generation ("4G") technologies under fair, reasonable, and non-discriminatory ("FRAND") terms and conditions.

7.      According to ETSI IPR Policy, if an ETSI member owns IPR, including patents, that may be considered essential to a particular standard or technical specification, ETSI requests that the owner grant irrevocable licenses on FRAND terms and conditions in return for inclusion of such IPR into the standard.

8.      Clause 6 of ETSI's IPR Policy states:

"When an ESSENTIAL IPR relating to a particular STANDARD or TECHNICAL SPECIFICATION is brought to the attention of ETSI, the Director-General of ETSI shall immediately request the owner to give within three months an irrevocable undertaking in writing that it is prepared to grant irrevocable licenses on fair, reasonable and non-discriminatory ("FRAND") terms and conditions"

9.      If the essential IPR owner refuses to undertake the requested commitment and informs ETSI of that decision, the ETSI General Assembly must "review the requirement for that STANDARD or TECHNICAL SPECIFICATION and satisfy itself that a viable alternative technology is available for the STANDARD or TECHNICAL SPECIFICATION" that is not blocked by that IPR and satisfies ETSI's requirements.  ETSI IPR Policy, § 8.1.1.  Absent such a viable alternative, the ETSI IPR Policy requires that "work on the STANDARD or TECHNICAL SPECIFICATION shall cease."  *Id.*, § 8.1.2.  In other words, ETSI will not agree to incorporate a member's technology in a standard under consideration unless the member irrevocably binds itself to granting licenses on FRAND terms.

10.      Philips is a member of ETSI and has submitted at least five ETSI IPR Licensing Declaration forms declaring a large number of its United States and foreign patents and patent applications as essential to the standards for the 2G, 3G, and 4G technologies.  Philips also promised that it is "prepared to grant irrevocable

licenses under . . . terms and conditions which are in accordance with Clause 6.1 of the ETSI IPR Policy."  As a 3GPP "Individual Member," Philips was "bound by the IPR policy" of ETSI, the Organizational Partner through which Philips participated in 3GPP.  Philips thus intentionally induced ETSI, 3GPP, their members and affiliates, and anyone implementing any of the standards, including u-blox, to rely on Philips' representation that it had granted and/or would grant licenses on FRAND terms and conditions in developing, adopting, and implementing the 2G, 3G, and 4G standards.  These standards have been and are implemented worldwide, including in the United States and California, in a variety of wireless electronic devices.

11.     u-blox has invested substantial resources in developing and marketing cellular modules that implement the 2G, 3G, and 4G standards worldwide, including in the United States and California, relying on the assurances of participating IPR holders — including Philips — that any patents identified pursuant to ETSI's IPR Policy by such IPR holders would be licensed on FRAND terms, regardless of whether such IPR were, in fact, used in any particular implementation.[1] Accordingly, u-blox is a third-party beneficiary of Philips' FRAND commitments to ETSI and 3GPP.

12.     After intentionally locking in the industry including implementers like u-blox, through the standard(s), Philips then breached its promise to ETSI and its members and affiliates by refusing to provide u-blox with a licensing rate that is consistent with Clause 6 of ETSI's IPR Policy. Instead, Philips demanded royalties

_____

[1] u-blox does not accept Philips' representation that any (or all) of the patents identified as "essential" are, in fact, necessary for the compliant implementations of 2G, 3G, and 4G technologies; nor does u-blox concede that the particular implementations of such technologies in its products practice any Philips' patents, including those identified by Philips in relation to these technologies.   Nonetheless, u-blox has relied upon the IPR declarations of Philips, and other holders of declared-essential patents.

that are discriminatory and far higher than only the *ex ante* value of its SEPs, as opposed to the additional value created by those patents' inclusion into standards.

13.     Because Philips asserted that its patents are "essential" and promised that it would grant a license to any such patents on FRAND terms and conditions, companies that relied on Philips' commitments are entitled to receive the benefit of a fair, reasonable and non-discriminatory license.

14.     Accordingly, u-blox seeks:  (i) a judicial declaration that Philips' promises to ETSI, 3GPP, and their respective members and affiliates constitute contractual obligations that are binding and enforceable by u-blox; (ii) a judicial declaration that Philips has breached these obligations by demanding excessive, unfair, unreasonable, and discriminatory royalties from u-blox; (iii) a judicial decree enjoining Philips from further demanding excessive royalties from u-blox that are not consistent with Philips' FRAND obligations; (iv) a judicial accounting of what constitutes a FRAND royalty rate in all respects consistent with Philips' commitment to license its patents identified as (or alleged to be) "essential" to the 2G, 3G, and/or 4G standards; (v) a judicial determination of and compensation for Philips' breach; (vi) a judicial determination that Philips' deceptive and deliberately false declarations to ETSI constitute violations of Section 2 of the Sherman Act; (vii) a jury trial on all issues so triable, including as to u-blox's other state law claims; and (viii) all other relief to which u-blox may be entitled.

## THE PARTIES

15.     Plaintiff u-blox AG is a corporation organized and existing under the laws of Switzerland, having its principle place of business in Zürcherstrasse 68, 8800 Thalwil, Switzerland.

16.     Plaintiff u-blox San Diego Inc. is a wholly-owned subsidiary of u-blox AG.  u-blox San Diego Inc. is a corporation organized and existing under the laws

of Delaware, having its principle place of business at 12626 High Bluff Drive #200, San Diego, California 92130.

17.     Plaintiff u-blox America, Inc. is a wholly-owned subsidiary of u-blox AG.  u-blox America, Inc. is a corporation organized and existing under the laws of Delaware, having its principle place of business at 1902 Campus Commons Drive Suite 310, Reston, Virginia 20191.

18.     u-blox is a leading developer of global positioning technology, including products and services based on Global Navigation Satellite Systems (GNSS), including GPS and GALILEO, for the automotive, mobile communications, and infrastructure markets.  u-blox began offering wireless products and services in 2009.

19.     In 2011, u-blox acquired Fusion Wireless, a San Diego, California based provider of CDMA wireless modules for consumer and machine-to-machine (M2M) applications in North America.  As u-blox's Chief Executive Officer explained at the time, "[t]he acquisition of Fusion Wireless immediately gives u-blox new, cutting-edge wireless module products plus access to the huge embedded CDMA market in North America for both consumer and M2M applications. It also expands our wireless module technology roadmap to cover all popular standards used in the Americas based on a layout-consistent form factor. This will allow our customers to easily adapt their products to match geographical requirements as well as overcome network coverage limitations."

20.     Fusion Wireless has been integrated into u-blox as u-blox San Diego, and the combined company continues to develop and market wireless communications modules worldwide — including in California and throughout the United States.  Today u-blox offers a wide range of high-quality, scalable cellular modules perfectly suited for vehicle, industrial, and M2M applications, as well as mass-market consumer products with demanding size, cost and quality requirements.

21.     u-blox's wireless communications modules are capable of incorporating a wide variety of cellular technologies.  Supported cellular technologies provide global geographic coverage and include 2G, 3G, and 4G standards.  Even within the 4G standard, u-blox offers a wide range of products practicing different iterations of the 4G standard designed for vastly different tasks, including NB-IoT (LTE Cat NB1), LTE Cat M1, LTE Cat 1, LTE Cat 6, 4G LTE, and RPMA modules.  These different cellular technologies offer different levels of performance and cost benefits.  For example, u-blox's LTE Cat 1, LTE Cat M1, NB-IoT, and RPMA modules are designed to support a wide range of IoT applications requiring medium to very low data rates. This includes a broad spectrum of applications covering speeds high enough for voice and video streaming, as well as those that need optimized performance for ultra-low power consumption and extended in-building range.  In contrast, u-blox's high speed 4G LTE modules meet the needs of applications requiring high data rates, such as for HD video transmission and infotainment solutions.

22.     Upon information and belief, Koninklijke Philips N.V. is a corporation organized and existing under the laws of the Netherlands, with its principal place of business at High Tech Campus 5, 5656 AE Eindhoven, the Netherlands.

23.     Upon information and belief, Philips has offices and employees in California and regularly conducts business in California.

24.     Upon information and belief, Philips is a health technology company operating worldwide.  Philips purports to be "a leader in diagnostic imaging, image-guided therapy, patient monitoring and health informatics, as well as in consumer health and home care."

25.     Upon information and belief, Philips aggressively seeks to monetize its intellectual property portfolio — which includes patents declared essential to the 2G, 3G, and 4G standards — by targeting companies like u-blox that sell standards compatible products in California and around the world.  Philips' Intellectual

COMPLAINT

1 Property & Standards ("IP&S") group is responsible for monetizing Philips'
2 portfolio.  Philips IP&S purports to employ 245 IP professionals worldwide —
3  including IP professionals located in this District at 3721 Valley Centre Drive, Suite
4 500, San Diego, California 92130 — responsible for managing an overall portfolio
5 of 62,000 patents.  Philips has also conducted in-person negotiations with u-blox in
6 California and directed its negotiation correspondence to u-blox employees in
7 California.

8      26.     Upon information and belief, Philips purports to own over 1000 patents
9 spanning multiple jurisdictions and telecommunication technologies.  Philips claims
10 that its telecommunications licensing program covers "UMTS (3G); HSPA and
11 HSPA+ (3.5-4G); LTE (4G); and LTE Advanced (4.5G)."

12
13 **JURISDICTION AND VENUE**

14      27.     u-blox brings this action for damages, declaratory relief, costs of suit,
15 and reasonable attorneys' fees arising under, *inter alia*, the patent laws of the United
16 States, 35 U.S.C. § 1 et seq.; Section 2 of the Sherman Antitrust Act, 15 U.S.C. § 2;
17 and the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202.  Accordingly, this
18 Court has jurisdiction to hear this case pursuant to 28 U.S. Code § 1331.

19      28.     u-blox has standing to bring this action under Section 4 of the Clayton
20 Act, 15 U.S.C. § 15.

21      29.     This Court has subject matter jurisdiction over u-blox's pendent state
22 law claims pursuant to 28 U.S.C. § 1367.  Each of u-blox's state law claims arises
23 from the same factual nucleus as its federal law claims.

24      30.     This Court has personal jurisdiction over Philips because Philips'
25 actions cause harm in this State and judicial district.  Philips' wrongful conduct, in
26 the form of unreasonable demands made during licensing negotiations, has been
27 purposefully directed within this State and judicial district, including conducting
28 negotiations with u-blox personnel located within the district and attending an in-

1   person licensing negotiation with u-blox in Los Angeles on July 11, 2018.  u-blox's

2   injuries relate to such conduct in this State and judicial district.  The facts in this

3   Complaint support jurisdiction in this case.  Alternatively, this Court has personal

4   jurisdiction over Philips pursuant to Fed. R. Civ. P. 4(k)(2).

5         31.    Philips is a foreign corporation with its principle place of business in

6   the Netherlands and regularly transacts business in this judicial district.

7   Accordingly, venue is proper in this judicial district pursuant to 28 U.S.C.

8   §§ 1391(c) and 15 U.S.C. § 22.

9

10                           **FACTUAL ALLEGATIONS**

11        32.    u-blox brings this action for Philips' breach of its commitments to

12  ETSI, the 3rd Generation Partnership Project ("3GPP"), and their members and

13  affiliates — including u-blox — to license intellectual property rights ("IPRs") it

14  asserted as essential to wireless technologies known as second generation ("2G"),

15  third generation ("3G"), and fourth generation ("4G") technologies under reasonable

16  rates, on fair and reasonable terms, and under non-discriminatory conditions.

17              **Mobile Standards and the FRAND Commitment**

18        33.    Standard setting organizations ("SSOs"), such as ETSI, are voluntary

19  membership organizations whose participants engage in the development of industry

20  standards for the benefit of their members and affiliates, including third parties

21  implementing the standards.  SSOs and the standards they promulgate play a

22  significant role in the technology market by allowing companies to agree on

23  common technology standards so that compliant products implementing the

24  standards will work together.  Standards also lower costs for compliant products by

25  increasing product manufacturing volume and inter-brand competition and by

26  eliminating switching costs for consumers and/or manufacturers who want to switch

27  from products, services, or components provided by one company to those provided

28  by another company.

34.    Standards deliver economic benefits to innovators, firms that implement the standards, and consumers. Standards can also impose costs on these same constituencies, some of which stem from opportunistic behavior by owners of patents that cover or are declared to cover various technologies necessary to practice a standard. SSOs have adopted IPR policies to reduce those costs. When adhered to, these IPR policies benefit all of the constituencies.  Standard setting participants receive the opportunity to have their technology incorporated into the standard and to receive compensation for its use in a larger number of devices that operate using the standard.  SSO participants also enjoy benefits independent of potential royalty income, including recognition of leadership in the technology, increased demand for participants' products, advantage flowing from familiarity with the contributed technology potentially leading to shorter development lead times, and improved compatibility with proprietary products using the standard.

35.    Firms that implement the standard receive assurance that they will always have access to the standard-essential patents and will not be exploited by patent holders or disadvantaged relative to other implementers if they invest in implementing the standard or developing innovative products that may operate with the standard.  As the standard becomes more widely adopted and used, patent holders receive greater total compensation.  Likewise, consumers and firms benefit from continued innovation, reduced costs, and other efficiencies from widespread interoperability and economies of scale and scope enabled by the standard.  In contrast, IPR policy breaches can chill future standard-setting efforts, thus denying to standard setting participants, implementers, and consumers the many benefits of standard setting.

36.    Compatibility standards are commonly adopted in industries in which complementary products or components, manufactured by different firms, must interoperate, interface, or communicate with each other. When many companies produce components that must interoperate in a complex system, the collaboration

COMPLAINT

of industry participants is often the most efficient way to establish the requisite standards.  This collaboration often takes place in the context of formal SSOs that promulgate standards and set participation rules for their members.  The telecommunications industry has benefited from increased interoperability across devices and networks, and the 2G, 3G, and 4G cellular communications standards at issue are examples of compatibility standards.

37.     While there are many benefits to collaborative standard setting, collaborative standard-setting can also raise antitrust concerns.  For example, collaborative standard-setting has the potential to empower any individual firm that has IPR over one or more technologies that are declared essential to the standard to block other firms from practicing the standard or to raise significantly their costs of doing so.  Outside of the standard setting context, the extent to which a patent holder will be able to profit from an invention is limited by competition from alternative, non-infringing technologies or products.  Thus, even though a patent gives its owner the right to exclude unauthorized users, it does not necessarily confer monopoly power because constraining, non-infringing alternatives may be available.  However, incorporating patented technology into a standard artificially removes competition from those alternatives and provides the patent owner with incremental market power that can be exploited.  This incremental market power is due to the elimination of alternatives once the patents are incorporated into the standard, not the inherent technical value of the patents (*i.e.*, the contribution of the patented technology relative to the alternatives — the *ex ante* value).

38.     SEP owners gain the power to exclude or exploit because the process of standardization transforms what may have been only marginally valuable IP into essential IP needed by all firms that intend to manufacture, use, or sell standard-based products.  The U.S. Department of Justice and Federal Trade Commission have recognized the potential for SEP owners to abuse the power gained through standardization.  The effect is that the competitive constraints on the SEP owner's

-11-

COMPLAINT

licensing behavior are eliminated after standardization.  This elimination of alternatives confers market power on SEP owners relative to the pre-standard situation wherein alternatives (including the option of not including the relevant functionality at all) are potentially available in the technology market(s) and can constrain the licensing behavior of the SEP owner.

39.   Once a standard is set, and especially as manufacturers invest in and begin manufacturing products that can use or operate with the standard, it can be infeasible to revise the standard in order to avoid a SEP.  Revising a standard can be very costly to the industry implementing that standard because it may involve breaking the compatibility and interoperability that the standard provides.  Thus, changing a standard to eliminate a SEP whose owner attempts to exercise the undue market power gained from standardization is generally not feasible.  In sum, once an industry has adopted a particular standard, there are no alternative technologies that can implement a given functionality within the wording of the standard.  The *ex post* relaxation of competitive constraints on the SEP owner through the elimination of alternatives, together with the *ex post* negotiation of licenses, gives rise to the possibility that a SEP owner will act opportunistically and "hold up" some or all standard implementers by extracting higher royalties *ex post* than it could have bargained for *ex ante*.  To prevent the exploitation of the SEP owner's market power in this situation, there must be other constraints on the SEP owner's licensing behavior, such as obligations to license on FRAND terms.

40.   SSOs typically impose IPR rules on their participants to protect against (or minimize the likelihood of) opportunistic, anticompetitive behavior by owners of standard-essential IP.  Such opportunistic behaviors expropriate at least a portion of an implementer's returns from sunk investments in innovation.  If an implementer or potential implementer anticipates that there is a material risk of opportunistic behavior, its incentives to engage in innovative activities will be reduced or possibly even eliminated, particularly when the opportunistic SEP holder seeks to hold up the

implementer for all or a large part of the profits from the implementer's innovations, complementary products, or services.  By protecting against opportunistic behavior, SSO rules pertaining to IPR are intended to provide an environment that promotes investment, innovation, and technological progress.  These IPR rules typically call for SSO participants to identify through declaration any potential SEPs covering the proposed standard and agreeing to license all implementers of the standard on fair, reasonable, and non-discriminatory terms.

### ETSI's IPR Policy

41.     ETSI is an independent, non-profit SSO that is responsible for the standardization of information and communication technologies, including mobile cellular technologies, for the benefit of its members and affiliates.

42.     3GPP is a collaborative activity through a group of recognized SSOs in the information and communication industry, including ETSI.

43.     ETSI, in partnership with 3GPP, has been involved in standardizing a number of 2G, 3G, and 4G mobile cellular technologies.

44.     The ETSI IPR Policy requires members to disclose on a timely, bona fide basis all intellectual property rights that they are aware of and believe may be essential to a proposed ETSI standard.  In particular, Clause 4.1 of the ETSI IPR Policy provides that: "each [ETSI] MEMBER shall use its reasonable endeavours, in particular during the development of a STANDARD or TECHNICAL SPECIFICATION where it participates, to inform ETSI of ESSENTIAL IPRs in a timely fashion."  This obligation to disclose extends to members' affiliates as well.

45.     ETSI's IPR Policy requires that participants disclose their relevant IPR during the development of a standard so that they may request that members owning patents potentially essential for the practice of a standard irrevocably commit to license those patents on FRAND terms and conditions to anyone practicing the standard:

-13-

> "When an ESSENTIAL IPR relating to a particular STANDARD
> or TECHNICAL SPECIFICATION is brought to the attention of
> ETSI, the Director-General of ETSI shall immediately request
> the owner to give within three months an irrevocable undertaking
> in writing that it is prepared to grant irrevocable licences on fair,
> reasonable and non-discriminatory [FRAND] terms and
> conditions under such IPR…   The above undertaking may be
> made subject to the condition that those who seek licences agree
> to reciprocate."

ETSI IPR Policy, § 6.1, pp. 1-2.

46.     Clause 6.1 lists "MANUFACTURE, including the right to make or have made customized components and sub-systems to the licensee's own design for use in MANUFACTURE" as among the uses for which SEP holders must make mandatory FRAND licensing commitments.

47.     FRAND commitments, pursuant to Clause 6 of the ETSI IPR Policy, "shall be interpreted as encumbrances that bind all successors-in-interest."

48.     ETSI defines "essential" as follows:

> "ESSENTIAL" as applied to IPR means that it is not possible on
> technical (but not commercial) grounds, taking into account
> normal technical practice and the state of the art generally
> available at the time of standardization, to make, sell, lease,
> otherwise dispose of, repair, use or operate EQUIPMENT or
> METHODS which comply with a STANDARD without
> infringing that IPR.  For the avoidance of doubt in exceptional
> cases where a STANDARD can only be implemented by
> technical solutions, all of which are infringements of IPRs, all
> such IPRs shall be considered ESSENTIAL.

ETSI IPR Policy, §15.6, pp. 6-7.

49.     Although ETSI defines what it means by "essential," it does not make any attempt (nor, in general, do any SSOs) to ascertain whether the patents declared as "essential" to a standard are valid and enforceable, or whether they are, in fact, technically essential.  Which patents are deemed "essential" to a particular standard is self-proclaimed by the SSO member that declares its patents to be "essential" to the standard.

50.     Clause 8.1.1 of the ETSI IPR Policy states that "[w]here prior to the publication of a STANDARD or a TECHNICAL SPECIFICATION an IPR owner informs ETSI that it is not prepared to license an IPR in respect of a STANDARD or TECHNICAL SPECIFICATION in accordance with Clause 6.1 above, the General Assembly shall … satisfy itself that a viable alternative technology is available …." If, in the opinion of the General Assembly, no viable alternative technology exists, Clause 8.1.2 further provides that work on the standard or technical specification at issue "shall cease."

### Philips' IPR Declarations

51.     As a member of ETSI and a participant in 3GPP standardization, Philips had an opportunity to make intentional and deceptive promises as part of the standard-setting process to further its own anticompetitive goals.

52.     In conjunction with the adoption of the 2G, 3G, and 4G standards, Philips made submissions to the technical bodies within ETSI, declaring that certain of its patents or patent applications may be or may become essential to the mobile device standards under consideration.  Philips also purported to commit to license any such essential patents it held on FRAND terms and conditions

53.     For example, on November 26th, 2009, on behalf of Philips, Ruud Peters signed and submitted an IPR Information Statement and Licensing Declaration declaring that:

"To the extent that the IPR(s) disclosed in the attached *IPR Information Statement Annex* are or become, and remain ESSENTIAL in respect of the

-15-

ETSI Work Item, STANDARD and/or TECHNICAL SPECIFICATION identified in the attached *IPR Information Statement Annex*, that the Declarant and/or its AFFILIATES **are prepared to grant irrevocable licenses under this/these IPR(s) on terms and conditions which are in accordance with Clause 6.1 of the ETSI IPR Policy.**" (Emphasis added.)

54.    In other words, Philips entered into an irrevocable undertaking to grant licenses to the disclosed patents allegedly essential to the UMTS standard on FRAND terms and conditions.  Including the above example, Philips has submitted at least the following declarations to ETSI, true and correct copies of which are attached as exhibits:

| Date | Signatory | Standard(s) | Dec. No. | Exhibit No. |
|------|-----------|-------------|----------|-------------|
| 1/15/1998 | H. Beckers | UMTS | GD-190001-025 | Ex. 1 |
| 9/6/2001 | H. Beckers | GSM | ISLD-200210-008 | Ex. 2 |
| 8/28/2003 | H. Beckers | UMTS | ISLD-200309-005 | Ex. 3 |
| 11/26/2009 | R. Peters | UMTS | ISLD-201001-011 | Ex. 4 |
| 12/3/2014 | B. Hinman | UMTS, LTE | ISLD-201412-005 | Ex. 5 |

55.    Philips made these declarations to ensure that the 2G, 3G, and 4G standards incorporated its technologies to the exclusion of alternative technologies, such that manufactures of standard-complaint devices would need a license to Philips' alleged SEPs.

56.    While making the above declarations to ETSI, Philips concealed its intent to, among other things, charge supra-competitive royalty rates and demand discriminatory terms and conditions for a license to its alleged SEPs.  The intent of this concealment was to deceive ETSI members so that technologies Philips claims to have patented were included in the standards.  Pursuant to the ETSI IPR Policy, if Philips had been honest regarding its refusal to license its alleged SEPs on FRAND

terms and conditions, ETSI would have looked for alternative solutions to Philips' technology or omitted that particular portion of the standard.  *See* ETSI IPR Policy, § 8.1.3.  But for Philips' deceptive IPR declarations, alternative technologies would have been adopted into the standards by ETSI or no particular technology would have been specified.

**Overview of Cellular Standards**

57.     Philips's unlawful and anticompetitive behavior pertains to patents that it claims are essential to the 2G, 3G, and 4G cellular standards.

<u>The 2G Standard</u>

58.     The first widespread use of mobile phones began in the late 1970s and into early 1980s with analog systems, generally referred to as "1G."  From the viewpoint of a typical consumer experience today, these systems were relatively basic, supporting just a few analog signals (as opposed to digital signal) capable of carrying voice calls.  AMPS (Advanced Mobile Phone System) was one of the most successful 1G systems, and was widely deployed in the USA in the 1980s.  However, there were many other regional and national systems in operation around the world at that time, leading to a fragmented market with individual regions having their own vendors and standards that were incompatible with one another.  Today, none of these systems are commercially operational.

59.     In the late 1980s, the cellular industry moved towards a second generation of mobile telephony, based on digital technology.  Such systems introduced a number of important benefits over the previous analog 1G systems, such as improved voice quality, increased system capacity, increased system security, and the ability to integrate voice and data services.

60.     For the first time, SMS (Short Messaging Service, *i.e.,* "texting" or "texts") and basic data services became available.  But there were divergent views on how to effectuate these benefits.  Thus, there were a number of different

standards considered to be 2G, including GSM, GPRS & EDGE, and CDMA & IS-95.

61.    In Europe, a system called Global System for Mobile Communications ("GSM"), originally referred to as Groupe Spécial Mobile, evolved to become the dominant worldwide 2G standard.

62.    GSM incorporated a number of technical advances over previous cellular systems.  GSM introduced digital voice coding, which digitized voice calls and allowed better call quality.  GSM also adopted for the air interface protocol the well-known Time Division Multiple Access ("TDMA") scheme.  TDMA operates by defining a number of time slots, and allocating the repetitive occurrence of a different time slot to each user.  The collection of Time Slots for all users are carried within a single frequency.

63.    Over the years, the functionality of GSM has been extended to support improved data services.  These enhancements include a data service called General Packet Radio Services ("GPRS"), which introduced relatively low speed packet data support in addition to GSM voice services and then-existing GSM circuit-switched data services.  GPRS was then extended to a technology called Enhanced Data rates for GSM Evolution ("EDGE"), often referred to as Enhanced GPRS or EGPRS, which further increased the supported data rates.

64.    GSM and these newer variants are still in use today.  They can support voice service and user data rates with low to moderate data transmission speed. However, their importance has been quickly diminishing on a global basis as network operators move to "next generation" systems providing higher data rates for transmission of information much more efficiently, which benefits both the network operators and end users.

65.    Despite the availability and widespread, global adoption of GSM, the technology was not initially widely commercialized in the United States.  In the United States, a different Second Generation ("2G") technology, based on a

different wireless air interface named Code Division Multiple Access ("CDMA"), was being strongly championed by Qualcomm.  Qualcomm eventually succeeded in getting its technology standardized.  The corresponding standard is called IS-95.

66.     At a very basic level, CDMA operates by assigning each user a unique identifier, a "spreading code," which is used to "spread" all the digital data transmitted to or from that user.  Because each user has a unique spreading code, a user need not be assigned a specified time slot as is required with TDMA.  With CDMA, multiple users can communicate at the same time (*i.e.,* simultaneously) using the same frequency by transmitting messages that have been spread using different "spreading codes."

67.     Despite many early technical setbacks and much skepticism from the GSM industry, Qualcomm's CDMA technology was standardized as IS-95, and commercialized under the name CDMAOne.  It became widely deployed by several carriers in the United States in the mid to late 1990s, after initially being successfully deployed in South Korea.

<u>The 3G Standard</u>

68.     In the mid to late 1990s, the cellular industry started a push towards a newer, more advanced system, able to support more users with improved reliability and better handling of data services.

69.     Originally the hope was to adopt a single, global standard.  However, over time, it became apparent that diverging regional interests would prevent a single system from being adopted.  On the one hand, supporters of the GSM-based standards pushed to have a system based on the GSM core network, but with an enhanced Radio Access Network incorporating a new CDMA-based air interface known as Wideband CDMA ("WCDMA").  This standard is known as Universal Mobile Telecommunications System, or "UMTS."  On the other hand, supporters of the IS-95 family of standards pushed to enhance the existing IS-95 core network and CDMA air interface, to develop a new standard known as CDMA2000.

-19-

70.     The first UMTS standard developed by 3GPP was called Release 99, and was followed by a minor "cleanup" revision called Release 4.  The first major upgrade came in 2002 with Release 5, including a new feature called High Speed Downlink Packet Access ("HSDPA"), which was followed by Release 6 in and around early 2005 that introduced High Speed Uplink Packet Access ("HSUPA"). Together HSDPA and HSUPA (collectively known as High Speed Packet Access or "HSPA") enhanced the download and upload speeds as compared to the original baseline specification.  In 2007, Release 7 included an enhancement named High Speed Packet Access Evolution ("HSPA+"), which includes a number of technical modifications to support even higher data rates.  More recent releases have further improved functionality.

71.     UMTS, as improved through the various releases, remains in widespread use around the world today.

### The 4G Standard

72.     For the first time in the evolution of cellular standards, the global cellular industry converged to a single wireless standard for use worldwide in the late 2000s:  Long Term Evolution ("LTE").  This standard was developed by 3GPP, and it provides a natural evolutionary path for both UMTS and CDMA2000 network operators and their customers.  Similar to the earlier generations, LTE also continues to evolve, including advances such as LTE-Advanced.

73.     Work began in earnest on developing LTE around 2006, under the leadership of 3GPP.  The first technical specifications, known as Release 8, were published in 2008.  Release 8 includes functionality that theoretically supports downlink data rates of about 300 Mbps and uplink data rates of about 75 Mbps.

74.     In 2011, an upgrade to LTE was published, referred to as Release 10, incorporating many features of what was known as LTE-Advanced.  This upgrade includes a number of major technical enhancements to considerably increase LTE functionality.  Commercial deployments of LTE-Advanced are in progress today.

75.     Development of the LTE standard continued beyond Release 10 with incremental improvements to the standard, including many relevant to u-blox's cellular modules.

76.     In Release 12, 3GPP specified low-price machine-communication terminals as LTE terminal Category 0.  These terminals feature a maximum data rate of 1Mbps, support for frequency division duplex and half duplex, and support for single antenna reception.

77.     In Release 13, 3GPP defined two new terminal categories.  Category M1 includes the features of Category 0, with the transceiver bandwidth limited to 1.08 Mhz and support for coverage extension of approximately 15db.  These limitations have cost reduction effects for chipsets compared to Category 0.  Second, Release 13 defined the Narrowband IoT ("NB-IoT") category of devices.  NB-IoT is a subset of the LTE standard focused on indoor coverage, low cost, long battery life, and high connection density.  The NB-IoT category features transceiver bandwidth limited to 180kHz and support for coverage extension greater than 20db.

78.     As of Release 13, the LTE standard defines 19 separate categories of user equipment ("UE").  These categories depending on maximum peak data rate and MIMO capabilities supported by the UE.

**Hold-up and Royalty Stacking**

79.     Despite SSOs adopting IPR Policies incorporating FRAND commitments, SEP owners frequently attempt to exploit their monopoly power to extract supra-competitive royalty rates after implementers are locked into the standardized technology.

80.      The exploitation of SEPs to extract unreasonable or discriminatory royalties is referred to as patent "hold-up."  The cumulative royalty burden required to satisfy all SEP holders is referred to as royalty stacking.

81.     Hold-up harms competition and impedes implementation of standards, diminishing any benefits that flow from widespread adoption of the standard.  The

anticompetitive effects of hold-up are magnified when the total aggregate royalty stack is analyzed.  The total royalty stack must be reasonable when viewed in the aggregate.  The demands of individual SEP owners must be assessed in light of the total number of SEPs included in the standard and their relative technical contributions.

82.   A number of cases that have been litigated in U.S. courts demonstrate that patent hold-up is a widespread problem, with SEP owners violating their FRAND commitments by making royalty demands significantly above the adjudicated FRAND rates.  *See, e.g*, *In re Innovatio IP Ventures, LLC Patent Litig.*, 2013 WL 5593609, at *43 (N.D. Ill. Oct. 3, 2013) (for 19 asserted patents, assessing damages of $0.0956 per unit as compared to the proposed royalty of $16.17 per unit for tablet computers); *Microsoft Corp. v. Motorola, Inc.*, 2013 WL 2111217, at *100 (W.D. Wash. Apr. 25, 2013) (determining, FRAND rate of $0.03471 per Microsoft's xBox unit, as compared to Motorola's initial demand of $6-$8 per xBox unit); *TCL Commun. Tech. Holdings, LTD v. Telefonaktiebolaget LM Ericsson*, 2017 WL 6611635, at *51-52 (C.D. Cal. Dec. 21, 2017) (determining FRAND rates of 0.314%-0.45% for 4G, 0.224%-0.30% for 3G, and 0.09%-0.16% for 2G, as compared to Ericsson's demand of 1.5% for 4G, 1.2% for 3G, and 0.8%-1.0% for 2G).

83.   Like the SEP owners from these cases, an analysis of Philips' non-FRAND offers to u-blox demonstrates that Philips is attempting to abuse its monopoly power to extract the hold-up value of its alleged SEPs.  Philips' offers to u-blox are completely untethered to the *ex ante* value of Philips' alleged SEPs, and would create an unsustainable royalty stack.  In light of Philips' continued unreasonable demands and threats of litigation and injunctions, u-blox had no choice but to resort to a judicial determination of the terms for a fair, reasonable, and non-discriminatory license.

### Philips' Breach of Its Obligations to License on FRAND Terms

84.     Philips is required to license its declared essential patents consistent, in all respects, with its binding commitment to ETSI, 3GPP, and participants and implementers of the applicable standards.  In disregard of its binding obligation to ETSI, Philips has refused to license its declared essential patents to u-blox on FRAND terms and conditions.  Instead, Philips is attempting to exploit its market power gained as a result of its deceptive and intentionally false FRAND commitments to attempt to extract supra-competitive royalties from u-blox.

85.     Courts, regulators, and economists have made clear that to be effective, the FRAND commitments in ETSI's IPR policy should: (a) limit royalties to the value that the SEP(s) had prior to inclusion in the ETSI standard and in light of other patented and unpatented technology essential to the standard; (b) prohibit charging royalties that are higher based upon the technology being written into the standard or that capture the value of the standard itself; and (c) require non-discriminatory treatment of licensees and potential licensees.

86.     Philips' licensing offers to u-blox have not been consistent with these FRAND principles.  Instead, Philips has negotiated in bad faith to exploit its monopoly power and attempted to maximize the hold-up value it can extract from u-blox.

87.     By way of example, a survey of all patents declared essential to the 2G, 3G, and 4G standards illustrates how far Philips' requested royalty rates diverge from a fair and reasonable royalty rate.  The study, conducted by Concur IP as part of unrelated litigation, evaluated a random sample of 33% of all the declared SEPs with at least one claim directed toward user equipment in order to determine which patents were actually essential to the individual standards.  Of the nine patents declared essential to the LTE standard by Philips, Concur IP determined that only one of these patents was actually essential.  Accounting for sample size, Concur IP's survey indicates that Philips has approximately three UE patent families which are

-23-

actually essential to the 4G standard.  Relying on the Concur IP survey, the Court in that litigation found that there were a total of 1481 patents that were essential to the 4G standard.[2]  Accordingly, Philips owns approximately 0.20% of all 4G SEPs for user equipment.  Philips' continuous and persistent demand for royalty rates several times higher than the adjudicated FRAND rate for a SEP owner holding a much larger SEP portfolio is unfair, unreasonable and, indeed, outrageous given its paltry share of 4G SEPs.  Extrapolating from Philips' royalty demand, the total royalty stack for all 4G SEPs using Philips' royalty  model would be nearly 750% of the selling price of LTE modules.  Philips' royalty demands cannot be consistent with its obligation to license its SEPs on fair and reasonable terms.  Such a demand can only be explained by Philips' attempt to exploit its undue market power to extract supra-competitive royalties that in no way reflect the value of the patented technology.

88.     Similarly, Concur IP's analysis for 3G determined that Philips holds approximately 18 out of a total of 953 3G SEPs, or 1.9% of all 3G SEPs.  Philips also demanded u-blox pay a royalty rate several times higher than the adjudicated FRAND 3G rates for other SEP owners.  Extrapolating from Philips' royalty demand, the total royalty stack for all 3G SEPs using Philips' royalty model would be over 75% of the selling price of 3G modules.  Again, Philips' royalty demand cannot be consistent with its FRAND obligation.

---

[2] The results of the Concur IP survey, which analyzed patents essential to all facets of the standards applicable to user equipment, may overestimate the number of Philips' SEPs applicable to u-blox's cellular module products which only practice a subset of the standards.  The Concur IP survey may also overestimate the number of Philips' SEPs for other reasons as well, including regional differences in the strength Philips' patent portfolio, the expiration of Philips' patents over the course of the license, exhaustion of Philips' alleged SEPs due to authorized sales to u-blox by licensees, among others.

89.     As a willing licensee — and in an attempt to avoid litigation — u-blox provided Philips with a counter-offer for a license to its 2G, 3G, 4G patents based on a calculation of Philips' proportional share of all SEPs which generously assumed that all alleged SEPs identified by Philips were actually essential to the standards.[3]  Despite u-blox's offer being significantly above the fair and reasonable price for a license to Philips' limited number of actually essential patents, Philips refused the offer and continues to demand royalties that are five to twelve times higher.

90.     In addition to its supra-competitive royalty demands, other actions by Philips during negotiations demonstrate its bad faith and anticompetitive intent.  For example, Philips is attempting to extract royalties from u-blox for patents that have expired or will expire during the course of the license.  Of the AMR/2G patent families identified by Philips, most or all of the patent families have either already expired or will expire several years prior to the proposed expiration of the license agreement the parties were negotiating.  Despite the expiration of its alleged SEPs, Philips is attempting to extend its monopoly and extract royalties after its technology enters the public domain.

91.     Further, Philips had demanded royalties for products which practice limited subset of the 4G standard – portions of the standard which Philips has not demonstrated its SEPs even cover.  Most of the improvements to 4G have focused on expanding bandwidth and speed in broadband LTE categories.  However, u-blox offers cellular modules incorporating low-power wide-area ("LPWA") LTE categories specifically developed for Internet of Things (IoT) and

---

[3] In addition to the essentiality of Philips' alleged SEPs, a number of other factors may also need to be addressed to determine the FRAND rate.  For example, the FRAND rate should address regional differences in the strength Philips' patent portfolio, the expiration of Philips' patents over the course of the license, exhaustion of Philips' alleged SEPs due to authorized sales to u-blox by licensees, among others.

COMPLAINT

Machine-to-Machine (M2M) applications – including LTE Cat 1, LTE Cat M1 and LTE NB-IoT.  These LTE iterations are designed with limited speed and functionality (for example, certain implementations do not support voice over LTE) in an effort to offer lower power consumption and less complexity.  Philips is attempting to extract its (already unfair and unreasonable) 4G royalty rates for these devices without even a bare showing that its patents cover the technology and/or without attempting to determine the value of its allegedly patented technology to u-blox' products.

92.     Moreover, Philips' offers to u-blox fail to account for potential exhaustion of Philips' SEPs due to licenses with upstream chipset suppliers. u-blox's cellular modules incorporate digital signal processors ("DSPs") and/or modems implementing the standards at issue which are manufactured by upstream chipset suppliers, including Intel, Marvell, and Qualcomm.  To the extent one or more of the upstream chipset suppliers is licensed to practice Philips' 2G, 3G, and/or 4G SEPs, Philips' patent rights are exhausted by an authorized sale to u-blox. Accordingly, FRAND terms and conditions must account for any licenses to Philips' SEPs held by upstream chipset suppliers.

93.     Philips' conduct during negotiations with u-blox cannot be reconciled with its FRAND commitment.  Put simply, Philips is attempting to exploit the monopoly power it gained through standardization to demand supra-competitive royalty rates which are grossly disproportionate to the value of the technical contribution of its small number of SEPs.

## CLAIMS FOR RELIEF
## FIRST CAUSE OF ACTION
### (Breach Of Contract)

94.     u-blox re-alleges and incorporates by reference the allegations set forth in the foregoing paragraphs.

95.     Philips entered into contractual commitments with ETSI, 3GPP and their respective members, participants, and implementers relating to the 2G, 3G, and 4G standards.  As a member of ETSI and to comply with ETSI's IPR Policy, Philips undertook a binding commitment to ETSI, ETSI members, and third party implementers to grant irrevocable licenses to Philips' SEPs on FRAND terms and conditions.

96.     Philips' ETSI membership and activities, including the declarations it made to comply with ETSI's IPR policy for Philips' SEPs, created an express and/or implied contract with ETSI and/or ETSI members, including an agreement Philips would license those patents on FRAND terms and conditions.  ETSI's IPR Policy does not limit the right to obtain a license on FRAND terms and conditions to ETSI members; third parties that are not ETSI members also have the right to be granted licenses under those patents on FRAND terms and conditions.  Each and every party with products that implement the 2G, 3G, and 4G standards promulgated by ETSI is an intended third-party beneficiary of Philips' contractual commitments.  u-blox, its suppliers, and its customers, are all intended third-party beneficiaries of Philips' FRAND contractual commitments.

97.     Despite u-blox's good faith efforts to negotiate a license to Philips' alleged SEPs, Philips has refused to offer u-blox a license on FRAND terms and conditions.  During negotiations, u-blox provided Philips with a counter-offer to license Philips' SEPs on FRAND terms and conditions, but Philips refused u-blox's offer and insists on royalty rates that are unfair and unreasonable.  Philips has breached its FRAND obligations by refusing to agree to license its SEPs at reasonable rates, with reasonable terms, and on a non-discriminatory basis, and by failing to provide separate rates for each of the standards practiced by the u-blox products.

98.     As a result of Philips' contractual breach, u-blox has been injured in its business or property and is threatened by imminent loss of profits, loss of customers and potential customers, and loss of goodwill and product image.

99.     u-blox has suffered and will continue to suffer irreparable injury by reason of the acts, practices, and conduct of Philips alleged above until and unless the Court enjoins such acts, practices, and conduct.

## SECOND CAUSE OF ACTION
### (Promissory Estoppel)

100.   u-blox re-alleges and incorporates by reference the allegations set forth in the foregoing paragraphs.

101.   Philips made a clear and definite promise to all potential implementers of the 2G, 3G, and 4G standards through its commitments to ETSI and 3GPP that it had granted, or would grant, licenses to any essential patents on fair, reasonable, and non-discriminatory terms and conditions.

102.   The intended purpose of Philips' promises was to induce reliance upon this promise so that companies like u-blox would invest substantial resources to design, develop, and produce products compatible with the relevant standards. Philips knew or should have reasonably expected to know that it would induce reliance on these promises by companies such as u-blox.

103.   u-blox developed and marketed its products and services in reliance on Philips' promises, including making its products and services compliant with ETSI and 3GPP standards, including the 2G, 3G, and 4G standards, in various u-blox product offerings.

104.   Philips is estopped from reneging on these promises to ETSI and 3GPP under the doctrine of promissory estoppel.

COMPLAINT

105.   u-blox has been harmed as a result of its reasonable reliance on Philips' promises and is threatened by the imminent loss of profits, loss of customers and potential customers, and loss of goodwill and product image.

106.   u-blox has suffered and will continue to suffer irreparable injury by reason of the acts and conduct of Philips alleged above until and unless the court enjoins such acts, practices, and conduct.

107.   Moreover, Philips' breach of its FRAND obligation further constitutes waiver and/or estoppel of Philips' rights to enforce any declared-essential patents against any entity allegedly practicing the standard.

## THIRD CAUSE OF ACTION
### (Declaratory Judgment)

108.   u-blox re-alleges and incorporates by reference the allegations set forth in the foregoing paragraphs.

109.   Philips is contractually obligated to license its 2G, 3G, and 4G SEPs on FRAND terms and conditions.  There is a dispute between the parties concerning whether Philips has offered u-blox a license to its 2G, 3G, and 4G SEPs on FRAND terms and conditions consistent with Philips' irrevocable commitments in its declarations to ETSI and the referenced policy of ETSI and 3GPP.

110.   As a result of the acts described in the foregoing paragraphs, there exists a definite and concrete, real and substantial, justiciable controversy between u-blox and Philips regarding what constitutes FRAND terms and conditions for a license to Philips' 2G, 3G, and 4G SEPs with respect to u-blox's products.  This dispute is of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.

111.   u-blox is entitled to a declaratory judgment that Philips has not offered license terms to u-blox conforming to applicable legal requirements, including failing to offer u-blox a license to its 2G, 3G, and 4G SEPs on FRAND terms and

conditions.  Moreover, u-blox is entitled to a declaratory judgment that sets the FRAND terms and conditions, including but not limited to the FRAND royalty rate, for a license to Philips' 2G, 3G, and 4G SEPs.

## FOURTH CAUSE OF ACTION

## Antitrust Monopolization In Violation Of Section 2 Of The Sherman Act)

112.   u-blox re-alleges and incorporates by reference the allegations set forth in the foregoing paragraphs.

113.   This is an action for antitrust monopolization in violation of Section 2 of the Sherman Act.

114.   As a member of ETSI and an active participant in 3G and 4G consensus standardization efforts through the 3GPP, Philips was obligated to comply with the ETSI IPR Policy.  That policy requires the owner of patents that might be essential to a standard to file an IPR disclosure statement that among other things contains an irrevocable commitment to be prepared to license the disclosed IPRs on FRAND terms and conditions to those who implement the relevant standards.  Over time, to secure inclusion of its own proposed technology in the evolving 3G and 4G standards, as well as other technology allegedly covered by its patents, Philips submitted IPR Disclosure Statements in which it promised to license its patents on FRAND terms and conditions.  As a result of Philips' IPR disclosures, its patented technology was allegedly incorporated into the standards and other alternative technologies that might otherwise have been considered for inclusion in the standard were not adopted.

115.   Philips' promises to license its allegedly essential patents on FRAND terms and conditions were intentionally false and misleading.  Philips had no intention of licensing its SEPs on FRAND terms and conditions.  During negotiations with u-blox, Philips has attempted to exploit its undue monopoly power by seeking to extract supra-competitive royalty rates, to force u-blox to pay royalties

-30-

on expired patents, to charge u-blox the same royalty rates for high-speed LTE categories and low-speed LTE which may not even practice Philips' alleged SEPs, among other FRAND violations.

116.   As a result of the alleged incorporation of its patented technology into the 2G, 3G, and 4G standards, Philips has monopoly power in the markets for those technologies.  As a result of its alleged incorporation in the standards, this technology is not interchangeable with or substitutable for other technologies, and those who comply with the 3G and 4G standards are locked in to those technologies. As a result, Philips has the power to extract supra-competitive prices for licenses for those technologies.  Accordingly, Philips has a dominant market share in the markets for these technologies and the markets have significant barriers to entry post-standardization.

117.   Philips has obtained and maintained its market power in these technology markets willfully and not as a consequence of a superior product, business acumen, or historic accident.  Philips excluded competition through its intentional false promise to license the relevant technologies on FRAND terms, which ETSI and its members relied on in choosing to incorporate standards-compliant technology related to Philips' allegedly patented technology.  Philips' deceptive conduct induced 3GPP and ETSI, through the voluntary consensus driven processes they use, to incorporate technology into the 3G and 4G standards that they would not have absent a FRAND commitment.

118.   Philips' actions show it has never intended to comply with its promises to license its allegedly essential patents on FRAND terms and conditions.  Philips refuses to engage with u-blox's good faith efforts to determine a fair, reasonable, and non-discriminatory terms and conditions.  Instead, Philips has repeatedly insisted u-blox pay royalty rates that are several times higher than justified by the strength of Philips' SEPs.

119.   These anticompetitive acts are an abuse of Philips' monopoly power in the relevant worldwide markets and establish a violation of Section 2 of the Sherman Act.

<u>Relevant Technology Markets</u>

120.   For the purposes of u-blox's antitrust claim, the relevant markets are the technologies covered by the Philips declared essential patents — inclusive of those issued in the United States and elsewhere — that Philips has asserted against u-blox products that implement the 2G, 3G, and 4G standards, together with all other alternative technologies to the Philips technologies that could have been incorporated into the standards (collectively, the "Relevant Technology Markets").

121.   Once ETSI adopts technology for a mobile standard, the owner of each essential patent whose technology is incorporated into that standard obtains monopoly power in a relevant technology market.  When patented technology is incorporated in a standard, adoption of the standard eliminates alternatives to the patented technology, and companies wanting to market devices that comply with the standard are locked in and must use the SEPs.

122.   As previously discussed, Philips has declared many of its patents to be essential to one or more of the standards and made irrevocable undertakings to license those patents on FRAND terms.  If Philips' declarations are correct, then the market encompassed within the Relevant Technology Markets can be identified from Philips' declarations to ETSI and Philips' allegations of essentiality during licensing negotiations with u-blox.

123.   Before the adoption of the Standards, competitors in the Relevant Technology Markets included companies with technology capable of performing the same or equivalent functions that could have been adopted by ETSI and its members.  These additional competitors include the companies that offered technologies that could have been used in alternative mobile standards that were foreclosed once ETSI members adopted a standard that included Philips'

technologies.  Because of the lock-in effect described above, Philips became the only commercially viable seller inside and outside the United States in each of the Relevant Technology Markets.

124.   After the standards were set and Philips' technology was adopted into the standard, implementers such as u-blox invested significant revenue and other resources developing products that practice the standard.  Those investments were made in reliance on the commitment Philips and other SEP owners made to license their patents on FRAND terms and conditions.  u-blox and other implementers were effectively locked into practicing Philips' technology when it was adopted into the standard, and, as a result, alternatives to the patent technologies no longer constrain Philips' ability to demand royalty rates far in excess of the value of the patented technology as the alternative technologies would have prior to the adoption of the standard ("*ex ante*").

Philips' Antitrust Violations

125.   Courts, regulators, and economists have made clear that to be effective, the FRAND commitments in ETSI's IPR policy should: (a) limit royalties to the value that the SEP(s) had prior to inclusion in the ETSI standard and in light of other patented and unpatented technology essential to the standard; (b) prohibit charging royalties that are higher based upon the technology being written into the standard or that capture the value of the standard itself; and (c) require non-discriminatory treatment of licensees and potential licensees.

126.   ETSI's FRAND commitment grant implementers the right to practice claimed SEPs.  Participants in standards development and third-party implementers rely on these irrevocable contractual undertakings to ensure that the widespread adoption of the standard will not be hindered by SEP owners seeking to extract unreasonable royalties and terms from those implementing the standard.

127.   u-blox asserts this counterclaim to enjoin Philips from continuing its abusive licensing practices and Philips' unlawful monopolization in certain relevant

markets for 2G, 3G, and 4G cellular technologies.  Philips has engaged in an unlawful scheme to exploit its undue market power over technologies necessary for implementers, including u-blox, to practice the 2G, 3G, and 4G standards.  Philips's market power is due solely to its false commitments to license its alleged SEPs on FRAND terms and conditions, which was a necessary step in locking its technology into the standard(s).

128.   Participants in the 2G, 3G, and 4G standardization, including all ETSI members and u-blox in particular, relied on Philips' intentionally false promises to license its alleged SEPs on FRAND terms and conditions in choosing to incorporate those allegedly essential patented technologies into the standards.  As a result of Philips' FRAND commitments, its allegedly essential patent technology was included in the standards and alternative technologies were excluded.  Through its deceptive acts and practices, Philips unlawfully monopolized the Relevant Technology Markets.

129.   After acquiring its unlawful monopolization of the Relevant Technology Markets, Philips has exploited this ill-gotten power against u-blox by, among other things:

- Refusing to honor its obligation to license its alleged SEPs on FRAND terms and conditions;
- Seeking supra-competitive royalty rates from u-blox for a license to its 2G, 3G, and 4G patents;
- Demanding u-blox pay royalties for alleged SEPs covering portions of the standards not practiced by u-blox's products;
- Demanding u-blox pay royalties for expired patents or patents that will expire during the course of the proposed license;
- Demanding u-blox pay royalties for alleged SEPs which are unenforceable against u-blox due to exhaustion.

130.   Philips' actions have injured competition by excluding alternate technologies which could have been included in the standard.  As a direct and proximate consequence of Philips' unlawful monopolization, customers of the Relevant Technology Markets (implementers of the standards such as u-blox) face drastically higher costs for access to cellular technologies necessary for the manufacture of standard-complaint products than they would have paid in a competitive marketplace.

131.   The antitrust injury associated with Philips' unlawful monopolization of the Relevant Technology Markets also extends to consumers in the downstream market for the technology, such as u-blox's cellular modules, in the form of higher prices, reduced innovation, and more limited choice for such standard-compliant products.  Indeed, the necessary result of raising costs to some competing manufacturers in the marketplace for standard-complaint products and diverting resources that otherwise would have fueled additional innovation has been to limit consumer choices in complementary technologies and other technology used in standard-complaint products.

132.   Philips has leverage over manufacturers of standard-compliant products that it would not possess but for its false promises to ETSI to license its alleged SEPs on FRAND terms and conditions, and its unlawful acquisition of monopoly power in the Relevant Technology Markets.  As a result of said leverage, manufacturers of standard-compliant products, including u-blox, must either capitulate to Philips' demand for supra-competitive royalty rates or face the costs and risks of protracted patent litigation on a global scale.

133.   Absent Philips' wrongful conduct, which resulted in alternate technologies being excluded from the relevant standards, u-blox would have been able to obtain access to necessary technology in the Relevant Technology Markets on fair, reasonable and non-discriminatory terms.

-35-

134.   Therefore, to remedy harms already inflicted and to prevent further harm to u-blox's business and property, including its cellular module products, and further harm to competition more generally in the Relevant Technology Markets, u-blox brings this action for treble damages, declaratory relief, and injunctive relief under Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15, 26.

## FIFTH CAUSE OF ACTION

### (Declaratory Judgment of Non-Infringement of U.S. Patent No. 7,127,247)

135.   u-blox re-alleges and incorporates by reference the allegations set forth in the foregoing paragraphs.

136.   U.S. Patent No. 7,127,247 ("the '247 Patent," attached hereto as Exhibit 6), entitled "Radio Communication System," indicates that it issued on October 24, 2006.  U.S. Patent and Trademark Office ("USPTO") records indicate that Koninklijke Philips NV is the assignee of the '247 Patent.

137.   There is a dispute between the parties concerning whether certain u-blox products infringe one or more claims of the '247 Patent.  During the course of licensing negotiations, Philips asserted that u-blox products infringe one or more of the '247 Patent claims by virtue of practicing the UMTS standard.  Philips provided u-blox with a claim chart alleging that at least claim 12 of the '247 Patent is essential to the UMTS standard.

138.   u-blox alleges that the '247 Patent is not essential to the UMTS standard and, therefore, u-blox's products which implement the UMTS standard do not practice one or more claims of the '247 Patent.  By way of non-limiting example, the UMTS standard does not require at least the claim limitation "the traffic reduction means being arranged to cause transmission of a reduced amount of control information on the uplink and downlink control channels while the uplink and downlink control channels are in the dormant state than the amount of control

COMPLAINT

information transmitted on the up link and downlink control channels during transmission of data packets on the data channel."

139.   No claim of the '247 patent has been or is infringed, either directly, contributorily, or by inducement, literally or under the doctrine of equivalents, by u-blox or the purchasers of u-blox's products through the manufacture, use, importation, sale, and/or offer for sale of u-blox's products, at least because, by way of non-limiting example, u-blox's products do not satisfy the following claim limitation: "the traffic reduction means being arranged to cause transmission of a reduced amount of control information on the uplink and downlink control channels while the uplink and downlink control channels are in the dormant state than the amount of control information transmitted on the up link and downlink control channels during transmission of data packets on the data channel."

140.   An actual and justiciable controversy exists between u-blox and Philips with respect to whether u-blox's products infringe one or more claims of the '247 Patent.

141.   Pursuant to the Federal Declaratory Judgment Act, 28 U.S.C. § 2201 *et seq.*, u-blox requests the declaration of the Court that u-blox's products do not infringe one or more claims of the '247 Patent.

## **SIXTH CAUSE OF ACTION**

### **(Declaratory Judgment of Non-Infringement of U.S. Patent No. 6,546,062)**

142.   u-blox re-alleges and incorporates by reference the allegations set forth in the foregoing paragraphs.

143.   U.S. Patent No. 6,546,062 ("the '062 Patent," attached hereto as Exhibit 7), entitled "Wireless Network," indicates that it issued on April 8, 2003. USPTO records indicate that Koninklijke Philips NV is the assignee of the '062 Patent.

144.   There is a dispute between the parties concerning whether certain u-blox products infringe one or more claims of the '068 Patent.  During the course of licensing negotiations, Philips asserted that u-blox products infringe one or more of the '062 Patent claims by virtue of practicing the LTE standard.  Philips provided u-blox with a claim chart alleging that at least claim 17 of the '062 Patent is essential to the LTE standard.

145.   u-blox alleges that the '062 Patent is not essential to the LTE standard and, therefore, u-blox's products which implement the LTE standard do not practice one or more claims of the '062 Patent.  By way of non-limiting example, the LTE standard does not require at least the claim limitation "after reception of information representative of a starting instant of a signaling sequence from the base station, the terminal is arranged to transmit the signaling sequence at said starting instant."

146.   No claim of the '062 patent has been or is infringed, either directly, contributorily, or by inducement, literally or under the doctrine of equivalents, by u-blox or the purchasers of u-blox's products through the manufacture, use, importation, sale, and/or offer for sale of u-blox's products, at least because, by way of non-limiting example, u-blox's products do not satisfy the following claim limitation: "after reception of information representative of a starting instant of a signaling sequence from the base station, the terminal is arranged to transmit the signaling sequence at said starting instant."

147.   An actual and justiciable controversy exists between u-blox and Philips with respect to whether u-blox's products infringe one or more claims of the '062 Patent.

148.   Pursuant to the Federal Declaratory Judgment Act, 28 U.S.C. § 2201 *et seq.*, u-blox requests the declaration of the Court that u-blox's products do not infringe one or more claims of the '062 Patent.

## **PRAYER FOR RELIEF**

WHEREFORE, u-blox prays for relief as follows:

A.     Adjudge and decree that Philips is liable for breach of contract;

B.     Adjudge and decree that Philips is liable for promissory estoppel;

C.     Adjudge and decree that Philips has not offered u-blox a license to its 2G, 3G, and/or 4G SEPs under reasonable rates, with reasonable terms and conditions, and that are demonstrably free of any unfair discrimination;

D.     Adjudge, set, and decree the FRAND terms and conditions that u-blox is entitled to for a license to Philips' 2G, 3G, and 4G SEPs;

E.     Enjoin Philips from further demanding excessive royalties from u-blox that are not consistent with Philips' FRAND obligations;

F.     Adjudge and decree that u-blox is entitled to license from Philips for any and all patents that Philips deems "essential" and/or has declared "essential" to the 2G, 3G, and 4G standards under reasonable rates, with reasonable terms and conditions that are demonstrably free of any unfair discrimination;

G.     Enjoin Philips from enforcing its 2G, 3G, and/or 4G SEPs against u-blox or any of its downstream manufactures or customers;

H.     Enjoin Philips from forcing u-blox to take a bundled license to Philips' SEPs that are not implemented by the portions of the 2G, 3G and/or 4G standards practiced by u-blox's products;

I.     Adjudge and decree that Philips has violated Section 2 of the Sherman Act and enjoin Philips from further violations of that statute;

J.     Adjudge and decree that u-blox does not infringe the '247 Patent;

K.     Adjudge and decree that u-blox does not infringe the '062 Patent;

L.     Enter judgment against Philips for the amount of damages that u-blox proves at trial, including, as appropriate, exemplary damages;

M.     Enter a judgment awarding u-blox its expenses, costs, and attorneys' fees under applicable laws;

COMPLAINT

N.    Award u-blox pre-judgment and post-judgment interest to the full extent allowed under the law, as well as its costs; and

O.    For such other and further relief as the Court deems just and proper.

Dated:  July 18, 2018

SHEPPARD, MULLIN, RICHTER & HAMPTON  LLP

By    /s/ *Stephen S. Korniczky*
      STEPHEN S. KORNICZKY
      MARTIN R. BADER
      MATTHEW W. HOLDER
      RYAN P. CUNNINGHAM
      Attorneys for Plaintiff
      u-blox AG

COMPLAINT

1

## **DEMAND FOR JURY TRIAL**

2          PLEASE TAKE NOTICE that u-blox hereby demands a trial by jury.

3

4    Dated:  July 18, 2018

5                         SHEPPARD, MULLIN, RICHTER & HAMPTON LLP

6

7                    By    /s/ *Stephen S. Korniczky*

8                          STEPHEN S. KORNICZKY
                           MARTIN R. BADER
9                          MATTHEW W. HOLDER
                           RYAN P. CUNNINGHAM
10                         Attorneys for Plaintiffs,
11                         u-blox AG

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

-41-